Rodella TIDWELL, Plaintiff,

v.

HOMESTAR REAL ESTATE SERVICES, Lincoln Mortgage Loans, Inc., First Franklin Finance Corp., Roshine Buckley and Mike Brezeale, Defendants.

Civ.A. No. 3:02CV532LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

Oct. 17, 2003.

---

Greta Regina Johnson, Johnson & Associates, Jackson, MS, for Plaintiff.

Joe S. Deaton, III, Stephanie Gee Beaver, Macneill & Buffington, P.A., David C. Dunbar, Dunbar Monroe, PLLC, Beth L. Orlansky, McGlinchey Stafford, Jackson, MS, Harold B. McCarley, Jr., Harold B. McCarley, Jr., PLLC, Ridgeland, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This cause is before the court on the motion of defendant First Franklin Finance Corp. (First Franklin) for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Rodella Tidwell has submitted a response in opposition to the motion, and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that First Franklin's motion is due to be granted for reasons which follow.

Plaintiff filed this action in the Circuit Court of Hinds County, Mississippi, on August 21, 2002 against Homestar Real Estate Services, Lincoln Mortgage Loans, Inc., First Franklin, Roshine Buckley and Mike Breazeale alleging claims for breach of contract, fraud and violations of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 et seq., in connection with plaintiff's purchase of a home, which purchase was financed by First Franklin. Following defendants' removal of the case pursuant to 28 U.S.C. § 1331 based on plaintiff's RESPA claims, First Franklin filed its motion for summary judgment. In its motion, First Franklin takes the position that it is entitled to summary judgment relative to plaintiff's RESPA allegations because the undisputed proof establishes that it fully complied with all RESPA requirements, and it maintains further that it cannot be liable to plaintiff for fraud, misrepresentation, coercion or predatory practices because the undisputed proof establishes that other than providing her the loan disclosures required by law, First Franklin had no direct dealings with plaintiff, and the other defendants were not acting on its behalf. The record, in fact, fully supports First Franklin's position on these points, and plaintiff, therefore, having failed to present

any evidence that would even arguably tend to create a genuine issue of material fact, cannot avoid the entry of summary judgment.

The relevant facts, as gleaned from the evidence of record, are as follows. From the excerpts of plaintiff's deposition which have been submitted by First Franklin, it appears that in January 2002, Roshine Buckley, who is identified by plaintiff's complaint as an employee of defendant Lincoln Mortgage, approached plaintiff about whether she would be interested in buying a house.[1] Buckley did a credit check on plaintiff "just out of the blue sky" and, after receiving and reviewing her credit report, Buckley assured plaintiff she could get her qualified for financing a home. Plaintiff testified that at first, she had no interest in buying a house, since at the time, she was sure that due to her age and lack of income, she could not possibly qualify for financing to buy a house. However, Buckley encouraged plaintiff to consider looking for a home to buy, and guaranteed she could qualify her for a home purchase. Thereafter, with prompting from Buckley, plaintiff began looking at houses, and eventually found one that Buckley told her she qualified for. On February 5, 2002, Tidwell signed a contract to buy the house, which contract had been prepared by Mike Breazeale at Homestar Real Estate Services. The contract was contingent upon plaintiff's ability to qualify for a new loan with interest not to exceed 10% payable over thirty years.

It is undisputed that Buckley, who presumably was an employee of Lincoln Mortgage, a mortgage broker, was the loan originator who arranged for plaintiff's home purchase to be financed by First Franklin. It is also undisputed that on February 6, 2002, First Franklin sent a pre-approval notice to Buckley at Lincoln Mortgage indicating approval for a loan to plaintiff at 10.75%, and that Buckley thereafter worked with First Franklin toward getting the loan finalized. On April 16, 2002, the loan was closed with an interest rate of 12.00, rather than the 10.75% that plaintiff says she understood she had been approved for, allegedly as a result of First Franklin's payment of a broker's fee to Lincoln Mortgage in the form of a yield spread premium.[2] In her complaint, plaintiff thus complains that she was the victim of fraud, and also vaguely asserts in her complaint that defendants violated RESPA.

1. Buckley, it seems, had been coming around to see her sister-in-law who worked at a center where plaintiff spent some of her time, and over the course of Buckley's visits, which related to her efforts to help her sister-in-law find a house, Buckley began talking to plaintiff about whether she would be interested in getting a house for herself.

2. In *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 739–40 (5th Cir.2003), the Fifth Circuit explained as follows:

Yield spread premiums enable borrowers to finance up-front closing costs by paying a higher interest rate on their home loan. HUD Policy Statement 1999, at 10,081. The yield spread premium is a payment from the lender to the broker, the amount of which reflects the loan's interest rate and consequently the lender's profits. *Id.* Although yield spread premiums are desirable from a policy standpoint, because they permit borrowers to finance up-front closing costs, they are criticized by some as blatant referral fees, varying only according to a higher interest rate pushed on the borrower and not by the broker's actual services. *See also Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201, 1204 (9th Cir.2003) ("A yield spread premium (YSP) is a payment made by a lender to a mortgage broker in exchange for that broker's delivering a mortgage ready for closing that is at an interest rate above the par value loan being offered by the lender. The YSP is the difference between the par rate and the actual rate of the loan; this difference is paid to the broker as a form of bonus."). As discussed infra, despite criticism of yield spread premiums, they are not per se illegal, as plaintiff seems to suggest.

*RESPA*

Although plaintiff alleged in her complaint that defendants violated RESPA, she failed to allege in what way any defendant was alleged to have violated RESPA. Her complaint recites only that "the Defendants violated several other RESPA violations in selling Tidwell a home." Despite her lack of specificity, First Franklin has moved for summary judgment on her putative RESPA claim, asserting in its motion that since it complied with all of RESPA's requirements, there can be no basis for plaintiff's RESPA claim.

RESPA seeks to ensure that real estate consumers "are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices." *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 738 (5th Cir.2003) (quoting 12 U.S.C. § 2601(a)). Among other things, section four of the Act requires mortgage lenders to disclose the costs associated with real estate closings, 12 U.S.C. § 2601, and in this vein, at 12 U.S.C. § 2603, mandates the development of a form disclosing "all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement ...." 12 U.S.C. § 2603(a). Regulation X, 24 C.F.R. § 3500 *et seq.,* sets out the HUD–1 Form which settlement agents must use "in every settlement involving a federally related mortgage loan in which there is a borrower and a seller," 24 C.F.R. § 3500.8(a), and also requires that lenders provide mortgage applicants with a "good faith estimate" of "each charge which ... the borrower will normally pay or incur at or before settlement based upon common practice in the locality

of the mortgaged property. Each such estimate must be made in good faith and bear a reasonable relationship to the charge a borrower is likely to be required to pay at settlement, and must be based upon experience in the locality of the mortgaged property," 24 C.F.R. 3500.7(c)(2).

RESPA additionally includes, in section eight of the Act, anti-fee splitting and anti-kickback provisions, which state, at § 2607(a)–(b):

(a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding ... that business incident to or part of a real estate settlement service ... shall be referred to any person.

(b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service ... other than for services actually performed.

12 U.S.C. § 2607(a)–(b). Despite this prohibition against kickbacks and referral fees, RESPA does permit "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed," 12 U.S.C. § 2607(c)(2), and defines settlement services as any service provided in connection with a real estate settlement, including "services rendered by a real estate agent or broker," 12 U.S.C. § 2602(3).

In light of plaintiff's failure to identify, in her complaint or otherwise, any provision or provisions of RESPA that were allegedly violated by First Franklin or any other defendant, defendants and the court are necessarily left to speculate to some degree as to the basis for this claim.[3]

---

**3.** The court notes that although First Franklin's motion directly seeks summary judgment with respect to any potential RESPA claim

plaintiff could possibly be asserting, plaintiff's response to the motion makes no mention of RESPA whatsoever. Her response, in fact, is

First Franklin, though, takes the position in its motion that plaintiff has no viable RESPA claim on any basis.

Regarding RESPA's disclosure requirements, First Franklin points out that the loan package it sent to plaintiff in advance of the closing included all the disclosures required by RESPA, which were covered in the following documents: a Settlement Costs Booklet; (2) Federal Truth in Lending (Regulation Z) form; (3) Good Faith Estimate and Required Service Provider Notice; (4) Disclosure Relating to Transfer of Loan Servicing; (5) Right to a Copy of Your Appraisal Report; (6) Flood Insurance Notice/Hazard Insurance Requirements; (7) Equal Credit Opportunity Disclosure; (8) Notice to Applicants; and (9) Understanding the Role of Your Broker and Broker Compensation. In addition, at the closing, she was provided with a Settlement Statement, which detailed the costs associated with the loan, and the Promissory Note, which plainly disclosed the 12% interest rate. First Franklin thus maintains that it provided plaintiff with all the information necessary for her to make an informed decision as to whether she wanted to continue with the proposed loan and that plaintiff, having this information available to her, elected to proceed with the loan and assume liability for its repayment. It is, in fact, clear that the relevant information was disclosed to plaintiff and that she chose to proceed with the transaction. Accordingly, First Franklin can have no liability to plaintiff based on any alleged violation of RESPA's disclosure requirements.

■ That having been said, it seems to the court, particularly considering plaintiff's response to First Franklin's motion, that rather than complaining of alleged nondisclosures in violation of RESPA, plaintiff's complaint based on RESPA relates to First Franklin's charging a yield spread premium which covered Lincoln Mortgage's broker's fee.[4] However, the law is well settled that the payment of a yield spread premium is not improper, and is an acceptable method for compensating the broker, so long as certain guidelines are followed, including (1) that the payment is disclosed; (2) the broker has provided goods and services for the borrower; and (3) the total amount of compensation paid to the broker is reasonable in the market. *McCrillis v. WMC Mrtg. Corp.,* 133 F.Supp.2d 470, 474 (S.D.Miss.2000); see also HUD RESPA Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052, 53053–53054 (October 18, 2001) (in order to "eliminate any ambiguity concerning [HUD's] position with respect

---

only two pages long, is unaccompanied by a memorandum of authorities (which is a requirement under the court's local rules), and does little more than inform the court that plaintiff opposes First Franklin's motion.

**4.** In her response, plaintiff states that although First Franklin pre-approved her at a rate of 10.75%, "First Franklin gave the 1.2% to Defendant Lincoln Mortgage in the form of a yield spread premium. Lincoln Mortgage received a yield spread premium in the amount of $1584.00 from First Franklin," and that "because of the increase in interest rate from 10.75% to 12%, the Plaintiff incurred a

larger debt from First Franklin." While plaintiff complains that a yield spread premium was paid, nowhere does she suggest just what it is about the payment that she contends rendered it unlawful.

It is not clear to the court whether plaintiff's complaint against First Franklin is based on a contention that the yield spread premium was unlawful under RESPA, or rather that First Franklin is guilty of fraud for having misrepresented to plaintiff that her interest rate would be 10.75% when it knew the rate would be higher. For purposes of the present discussion, the court assumes the former, though the latter is addressed infra.

to ... yield spread premiums and ... overcharges by settlement service providers ...," HUD reiterated "that yield spread premiums are not *per se* legal or illegal," and that they "can be a useful means to pay some or all of a borrower's settlement costs"). Plaintiff herein has not contended or shown that First Franklin failed to disclose the payment of a yield spread premium. She has not contended that Buckley, as an agent for Lincoln Mortgage, did not perform valuable services in relation to obtaining and finalizing her loan, and in fact, has acknowledged the work performed by Buckley. And plaintiff has not contended or undertaken to show that the total compensation paid to Lincoln Mortgage was not reasonable in the market.[5] Regarding this last factor, the Fifth Circuit has recently made clear that "[s]o long as the *total* compensation paid to the broker is reasonably related to the *total* value of the goods or services actually provided, there is no § 8 liability." *O'Sullivan*, 319 F.3d at 740. In fact, whereas Mississippi's Mortgage Consumer Protection Law, Miss.Code. Ann. § 81–18–1 *et seq.*, allows compensation to brokers not to exceed 7.95% of the loan, Miss.Code Ann. § 81–18–27, here, the loan documents with respect to plaintiff's loan reflect that at closing, Lincoln Mortgage received a lesser amount, 6% of the loan amount, including a 4% origination fee and the 1.2% yield spread premium. As this amount is presumptively reasonable under the law, *and* plaintiff has not even argued otherwise, the court concludes that plaintiff, in response to First Franklin's motion, has failed to create a triable issue of fact with regard to any putative RESPA claim.

*FRAUD:*

To the extent plaintiff's position is that First Franklin is guilty of fraud or misrepresentation by representing that she was pre-approved for a loan at 10.75% and thereafter charging her 12%, her claim fails as a matter of fact and law. The undisputed evidence provided by First Franklin in connection with its summary judgment motion establishes that while First Franklin did agree, in response to an inquiry by Buckley, that it would offer financing to plaintiff on certain terms, First Franklin was not involved in negotiation of the terms of the loan that plaintiff was seeking. First Franklin never met with plaintiff, and no agent of First Franklin ever contacted, spoke to, corresponded with or communicated with plaintiff, other than to send to her a disclosure package on April 10, 2002 which contained information concerning her loan as submitted by her mortgage broker. That is, First Franklin's *only* contact *with plaintiff* prior to the loan closing was its transmittal of the required disclosures concerning her loan, which is to say, First Franklin did not deal with plaintiff in connection with the transaction, but rather dealt exclusively with Lincoln Mortgage, an independent mortgage broker, in offering terms for plaintiff's mortgage.

First Franklin's proof in this regard is substantiated by plaintiff's own deposition testimony. Therein, Tidwell described at length various communications with and representations to her by Roshine Buckley, the Lincoln Mortgage employee who assisted her in her search for a home, in securing a contract for purchase of the

---

**5.** In *Bjustrom v. Trust One Mortgage Corp.*, 322 F.3d 1201, 1208 n. 14 (9th Cir.2003), the court observed that

A YSP payment made to a mortgage broker is just one element of his or her total compensation to be considered in evaluating overall reasonableness "in relation to price

structures and practices in similar transactions and in similar markets." HUD/SOP I, 64 Fed.Reg. at 10084; HUD/SOP II, 66 Fed.Reg. at 53055. Presumably, market forces should make the total compensation reasonable.

home and in obtaining financing. Tidwell consistently testified, however, that she did not know who the actual lender was until the closing,[6] and that she never talked with anybody at First Franklin before the closing.

Furthermore, included among the disclosures provided to plaintiff prior to closing was a document entitled, "Understanding the Role of Your Broker and Broker Compensation," which, under the heading, "Broker Compensation," informed plaintiff, as the borrower, that her broker was entitled to compensation for services furnished to her, and that she should discuss her broker's compensation with the broker and work with the broker to structure the loan in whatever way she and her broker thought best to cover the broker's fee. This disclosure document specifically stated that the borrower could choose to finance fees and costs, including the broker's fee, through a higher interest rate,[7] and informed the buyer as follows:

> You should discuss with your broker how to structure the interest rate and amount of fees and charges in the way

that best suits your particular circumstances. Any questions you may have concerning broker compensation and other fees and costs during the loan process can be answered by your broker.

The record evidence further establishes that on April 15, 2002, the day prior to closing, Roshine Buckley reviewed and sent to First Franklin a document detailing the final terms of the transaction, which, with respect to the Broker's Fees, reflected an amount of $1584 beside "Yield Spread *2%*," with a notation, "Max = 2% add YSP to par rate for final rate." With respect to interest rate, the document set forth a "Start Rate" and "Par Rate" of 10.75%, a "Yield Spread Premium" of 1.2%, and a "Final Rate" of 12.00%. This document included a Broker's confirmation, signed by Buckley, which stated as follows:

> I have read the above fees and charges and confirm that this information is correct. If any changes were required, I have made and initialed the changes.

---

**6.** Tidwell stated,

> I don't think I knew who—I don't remember knowing who the lender was until we was at closing, I don't think.
>
> . . .
>
> I didn't know First Franklin was loaning me the money until I got there.

**7.** The section entitled "Broker Compensation," stated as follows:

> In today's lending environment, you and your broker should work together to structure your loan to best meet your goals and objectives. If you would rather pay less cash, or if you do not have much cash available, you may finance your fees and costs. If you would rather pay a lower interest rate, you may pay higher points and fees. You should review the options with your broker and agree upon the terms of the loan (including the interest rate, points and fees), and the amount to be paid to the broker. If you choose to finance fees

and costs through a higher interest rate, the broker will receive part of the broker's compensation out of that increase in rate, in addition to, or in lieu of, fees or points paid by you to your broker. The lender-financed compensation is commonly referred to as an "interest rate premium." Usually, the specific amount of any broker compensation which will be financed by a lender through the interest rate will not be known until your broker locks in your loan with a lender, which will be after you have received your initial Good Faith Estimate from your broker. The Good Faith Estimate you receive with this disclosure shows an estimate of how your broker's compensation could be paid. You should discuss this compensation structure with your broker. The final amount of any such compensation will be shown on your loan closing known as a HUD-q or HUD–1A. Upon request, you may review this statement one business day before loan closing.

*I have reviewed the following fees and charges with the borrower(s): interest rate, terms, closing costs, payoffs, loan amount, fees. The borrower(s) is in full agreement with this information and is prepared to close.* I understand that incomplete or missing items may result in a delay of closing. (Emphasis added).

Finally, it is undisputed that at the closing the following day, the settlement statement and note which disclosed the 12% interest rate were reviewed with plaintiff, and, without questioning the rate or voicing any objection, plaintiff signed the loan papers and the loan was closed.[8] Four months later, she filed this suit.

It is clear from the foregoing that First Franklin advised Lincoln Mortgage that it would finance plaintiff's loan at the rate of 10.75%, and that First Franklin added the 1.2% yield spread premium to that rate only after first informing the borrower that she should discuss and determine *with her broker* the manner in which she chose to structure the loan to cover her broker's fee and only after receiving the broker's subsequent express confirmation that the borrower had agreed to the payment of a fee which included a 1.2% yield spread premium. It is also clear that plaintiff was aware of the 12% rate at the time of closing and made no objection to that rate but rather proceeded to sign the loan documents without question or comment.[9] Given the undisputed facts that First Franklin never dealt with plaintiff (prior to the loan closing) and never made any representations to her, and the absence of proof that First Franklin ever misrepresented any fact to plaintiff, it follows that she cannot recover on her claim for fraud against this defendant, and that summary judgment is therefore in order.[10]

Based on the foregoing, it is ordered that First Franklin's motion for summary judgment is granted.

---

8. Plaintiff testified that at the closing, she read the papers, at least enough to notice the 12% interest rate, and although she knew she was free to ask questions or refuse to proceed, she did not tell anyone there that she did not want to go forward with the purchase. She testified, in fact, that a Mr. Youngblood went over the papers with her at the closing, and that she did not say anything to him or to anyone else about not wanting to go through with the transaction.

9. It should go without saying that plaintiff's failure to comment on or object to the 12% rate at closing would have tended to confirm Buckley's prior representation to First Franklin that her client had agreed to the addition of the 1.2% yield spread premium. There is nothing in the record otherwise to suggest that plaintiff was unaware of the rate increase or reason for the increase.

10. Plaintiff did allege in her complaint that the other defendants were agents of First Franklin, suggesting that First Franklin cannot avoid liability merely because it did not directly commit fraud and is instead liable to the extent that any other defendant may have committed actionable fraud. Yet in response to First Franklin's motion, which is supported by proof in the form of the unchallenged affidavit of Vivian Hansen, Manager, Loss Mitigation for First Franklin, in which she states that none of the other defendants is or was an agent of First Franklin, plaintiff has presented no proof to suggest the existence of any agency relationship between First Franklin and any other defendant. On the contrary, plaintiff herself testified that Roshine Buckley, with whom she dealt exclusively and on whom she fully relied in this transaction, told her that she worked for "Mr. Mike" (Mike Brezeale), who owned Homestar, the real estate company through which the home purchase was made, and for Lincoln Mortgage. Plaintiff was not aware of *any* relationship between Buckley and First Franklin or First Franklin and any other defendant.